LUIS FONTÁNEZ, Plaintiff and Appellant, v. HEIRS OF JUAN BUXÓ-OCASIO, Defendants and Appellees.

No. 3748.   Argued January 27, 1927.—Decided February 4, 1927.

*Bolívar Pagán* for the appellant.   *González Facundo & González, Jr.* for the appellees.

Mr. Justice Hutchison delivered the opinion of the court.

Plaintiff in a filiation suit appeals from an adverse judgment and says that:

"The District Court of Humacao erred in weighing the evidence and in holding that it was insufficient to sustain plaintiff's claim."

The complaint seems to have been filed shortly after the death of the putative father, although plaintiff attained his majority some seven years before that event.

The argument for appellant assumes that the trial judge accepted as true the testimony for plaintiff; but we find no very satisfactory basis for this assumption in the statement filed and adopted as a part of the judgment below.

Plaintiff in his amended complaint alleged among other things:

"That during pregnancy, before pregnancy and at the time of the birth of plaintiff and subsequently thereto, Regina Fontánez was known to be living in concubinage with the said Juan Buxó Ocasio; that plaintiff, during the life of Juan Buxó Ocasio, enjoyed the continuous status of a natural son; that the said Juan Buxó Ocasio always treated the said Luis Fontánez publicly and privately as his son, calling him 'son' and the boy responded as such, addressing Buxó as 'father'; that the said Juan Buxó Ocasio always took care of the said Luis Fontánez and paid for his housing, education, medical assistance and maintenance, publicly and privately showing paternal affection toward him; and that the said Juan Buxó Ocasio also expressed on several occasions his desire and purpose to acknowledge legally the said Luis Fontánez as his son."

Referring to this averment and to the evidence adduced at the trial, the district judge said:

"The evidence in this case in support of such averment does not suggest the presumption that there existed any concubinage between Juan Buxó Ocasio and Regina Fontánez Martínez, nor the enjoyment of the status of a natural child in public opinion from the conduct of the alleged father showing an actual acknowledgment entirely voluntary, free and spontaneous. Nor is such evidence sufficiently clear, strong and convincing, as required by the law and jurisprudence. See *Estate of Díaz* v. *Estate of Díaz*, 17 P.R.R. 53; *Medina* v. *Heirs of Bird et al.*, 30 P.R.R. 151; *Morales* v. *Heirs of Cerame*, 30 P.R.R. 784.

"It has been shown in this case that Juan Buxó Ocasio had a concubine or mistress other than the mother of plaintiff, named Cruz Rodríguez or González, with whom he cohabited during almost all his life, for about fifty-five years, and that he died while suffering from a disease known as prostatic hypertrophy, that is an inflammation of the prostatic gland, which may produce sterility. There is no evidence at all that Juan Buxó Ocasio took care of the education of plaintiff, although the latter testified that he attended school and knows how to read and write. The plaintiff's mother, Regina Fontánez Martínez, testified that the medicines and food furnished her by Juan Buxó Ocasio for her son were purchased by order of the father in a store belonging to Esteban Hernández, up to the date on which the latter discontinued his business and her son was grown up; but the said Esteban Hernández, who was brought as a witness by plaintiff, gave no evidence in this regard, although he was called twice. The presumption is that his testimony on this point would have been adverse to plaintiff on the theory that it was willfully suppressed. 169 of the Law of Evidence (*sic*). Regina Fontánez Martínez also testified that during the four years that she lived with Juan Buxó Ocasio, although he had another mistress in the town, he came daily to spend the night with her; however, the night of the birth of the child, when there were persons present who might corroborate her testimony, he was not there. Plaintiff's mother merely testified that Juan Buxó Ocasio promised her to acknowledge the child and that he would take care of the child. From the testimony of Antonio Rotger it appears that Juan Buxó Ocasio told the witness on several occasions that he had never had a child, to which the witness replied, referring to plaintiff, that the latter was the son of Buxó even though he might deny it; and although said witness further stated that after citing instances, Buxó con-

sented to acknowledge the boy as his son; this was not a spontaneous and free act, and the non-acknowledgment of the boy up to the time of Buxó's death shows that he had no such intention. And conceding that Juan Buxó Ocasio on several occasions called the plaintiff his son, blessed him, gave him money—once the sum of $25.00, when the boy went to camp—these acts neither show entirely the intention to acknowledge, nor the enjoyment of the condition of a natural son.''

It is unfortunate that the only real issue involved should have been confused with such irrelevant matters as the question of concubinage and the nature of the disease which resulted in the death of the putative father. It is conceded that neither of these questions is involved in the instant case. But plaintiff himself, having alleged concubinage at the time of conception and birth, can not and does not complain because the court below noted the failure of proof in connection with such unnecessary averment.

It is also true that the district judge does not seem to have considered it necessary to discuss the evidence for the defense beyond the established fact of the only real concubinage in the case and the character of the last illness already mentioned. But the mere reference to these matters as bearing upon the sufficiency of the evidence adduced in support of the fifth averment plainly indicates that what the court had in mind was the evidence as a whole and not only the testimony for plaintiff.

The context immediately following such reference likewise leaves little room for doubt that in so far as the testimony for plaintiff was alone considered the same was not accepted as true, but on the contrary was deemed to be self-contradictory, unsatisfactory and untrustworthy. What the trial judge did concede, although apparently only for the sake of argument, is clearly stated in the concluding sentence of the extract, *supra*, and the proposition involved is obviously based upon and sustained by the opinion of this court in *Morales* v. *Heirs of Cerame,* 30 P.R.R. 784.

But appellant insists that the facts herein bring the case within the doctrine announced in *Jesús* v. *Succession of Pérez Villamil*, 19 P.R.R. 850; *Montalvo* v. *Montalvo*, 25 P.R.R. 800; *Vega* v. *Heirs of Vega*, 32 P.R.R. 548; *Guadalupe* v. *González*, 34 P.R.R. 643.

We quote from the brief of appellant enough to indicate the theory upon which the present action seems to have been brought:

"Let it be remembered that in the light of the statute under which the present action arose and in the light of the philosophical and social basis of that legal principle, it is only necessary to show in these cases that the alleged natural father executed such acts as may convey to the court the impression that in fact he was such a father. The law involved does not say what acts have to be shown. It leaves all of that, with a wise and humane end, to the opinion of the judges, who are men and know more or less the ordinary care given by a man to a son of his.

"The investigation of the relations on which paternity depends being difficult and repulsive, has been expressly prohibited by law. The law only allows, as a constant protection of the rights of the natural son, the investigation of the direct acts of the alleged father towards the presumptive natural son. It is natural and logical that jurisprudence, in determining the acts whereby paternity may be shown, has considered those obligations that the natural and positive law imposes upon parents with regard to the children, such as supporting them, housing them, and educating them. But, commentators and jurisprudence have considered other acts. It is a matter of reason and common sense that paternity may be shown by acts other than the maintenance, housing and education; in the same manner as it is logical that these acts by themselves are not inequivocal proof of paternity.

"It should never be forgotten that what the law contemplates in these cases, in compliance with its deep philosophical and social foundation, is to determine whether a person is a natural child. Any series of acts conveying such impression of paternity is enough to justify the court in giving as an act of judicial sanction and legal acknowledgment to the state of things produced through coition by the sentiments and instincts of two human beings.

"It should not be forgotten that neither the law involved in this suit (section 135, subdivision 2 of the Spanish Civil Code) nor the

spirit thereof requires proof as to whether a person supported, educated or lived with another; what the law requires is that it be shown that a person, in relation to another, acted in such a way as to establish the status of father and son, whether these acts are the ones above mentioned or others. The fundamental thing to be shown is whether these direct acts, whatever they may be, establish the relationship of father and son.

"Thus, construing this statutory provision and commenting on jurisprudence to that effect from the Supreme Court of Spain, the eminent jurist, Manresa, says:

" 'The judgment of November 7, 1896, has declared that the enjoyment of the status of a natural son should be necessarily revealed by acts showing the will of the father, or of the family in his stead, to consider as such natural son the person seeking a forced acknowledgment, such as housing, maintaining and educating him in that capacity, or by analogous acts of such significance and probative value as to show clearly that the child sustains as such natural son constant relations with his father, and, in the absence thereof, with the family of the latter.' (Manresa, Comentarios al Código Civil Español, fourth edition, pages 600 and 601)."

We quite agree with Manresa, but we can not concur in the interpretation placed upon the language quoted by appellant.

Manresa is not discussing paternity nor the method of proving maternity, but the continuous possession of the status of a natural child as defined by the Supreme Court of Spain in its judgment of June 26, 1903, quoted with approval and followed by this court in *Montalvo* v. *Montalvo* and *Vega* v. *Heirs of Vega, supra,* and the manner in which the fact of such possession must be established. See also *Alejandrina Montañez* v. *Fructuoso García, ante,* page 198.

A careful examination of all the evidence discloses no adequate ground upon which to question seriously the conclusion reached by the district judge.

The judgment appealed from must be affirmed.